2017 ND 124

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Christian Dupree HALL, Defendant and Appellant**

**No. 20160240**

Supreme Court of North Dakota.

Filed 5/16/2017

Ashley K. Schell, Ward County Assistant State's Attorney, Minot, ND, for plaintiff and appellee.

Eric P. Baumann, Minot Public Defender Office, Minot, ND, for defendant and appellant.

Kapsner, Justice.

[¶ 1] Christian Dupree Hall appeals from a criminal judgment entered after he conditionally pleaded guilty following the district court's denial of his motion to suppress and motion to dismiss for violation of Hall's right to a speedy trial. We conclude the district court did not err when it denied Hall's motion to dismiss for violation of Hall's speedy trial rights. We also conclude the district court did not err when it denied Hall's motion to suppress evidence. We affirm the criminal judgment.

I

[¶ 2] On October 1, 2015, Hall was arrested for possession of a controlled substance with intent to deliver after a search of his backpack revealed the presence of Oxycodone pills packaged in baggies. Hall made his initial appearance on October 2, 2015 and was charged with the offense by information on November 5, 2015 at the preliminary hearing. On December 7, 2015, Hall moved to suppress the evidence, arguing the evidence was obtained in violation of the Fourth Amendment. Hall argued the seizure of his person and of his backpack pending the issuance of a search warrant were both conducted in violation of his Fourth Amendment rights. Hall also argued the search warrant obtained prior to the search was not supported by probable cause.

[¶ 3] The district court held a hearing on Hall's motion to suppress evidence on January 11, 2016. At the hearing, an officer testified while conducting surveillance at the Amtrak station, he saw an individual exit the train station. The individual, later identified as Christian Hall, was observed carrying a backpack. The officer testified he observed Hall attempt to flag down a vehicle before it drove away. The officer then observed Hall enter a taxi. The officer followed the taxi and testified the taxi traveled "approximately 5 or 6 blocks before they actually made a u-turn and actually came back in the same direction in

which they were going." The officer testified the taxi's maneuvers were "indicative in regards to people ... that are actually trying to see if they are being followed or if they are being watched." The officer followed Hall's taxi to an apartment building where Hall exited and attempted to gain entry into an apartment. The officer learned from another officer that the patio door Hall approached belonged to an individual with pending drug charges. The officer testified he observed Hall knock on a garage door at the apartment complex. The officer testified after Hall was unable to gain entry into the apartment or the garage, Hall traveled to a fast-food restaurant.

[¶ 4] At the fast-food restaurant, the officer took a photograph of Hall and sent it to another officer in an attempt to identify him. The officer testified he was informed the individual photographed was Christian Hall. Hall was observed walking to a gas station where he waited for a different taxi to arrive. The officer followed Hall's second taxi to a hotel. At the hotel, the officer approached and spoke to Hall. The officer and Hall gave conflicting testimony as to who removed Hall's backpack from the taxi. An officer testified Hall stated he was in Minot to visit before stating he had no friends or family in Minot. An officer testified Hall also stated he was in Minot looking for a job. After asking Hall some questions, officers conducted a K–9 dog sniff on the backpack. Officers testified the dog alerted, and the officers seized the bag pending the approval of a search warrant application. Hall was told he could leave and did leave the area. After obtaining a search warrant, the officers searched the bag and discovered Oxycodone pills. Hall was later arrested at the airport.

[¶ 5] The district court denied Hall's motion to suppress evidence on February 10, 2016. The court concluded the initial seizure of Hall's backpack was supported by reasonable suspicion. The court also concluded the K–9 unit's alert on the backpack gave officers probable cause to seize the bag pending receipt of a search warrant. Lastly, the court concluded the search warrant was supported by probable cause.

[¶ 6] On February 16, 2016, Hall filed a demand for a speedy trial. At a pre-trial conference the following day, the district court informed the parties trial would be scheduled as soon as the court's calendar would permit. Trial was scheduled for May 24, 2016. On May 19, 2016, Hall moved to dismiss for violation of his right to a speedy trial. The district court denied the motion to dismiss on May 23, 2016. On May 23, 2016, Hall entered a conditional guilty plea. Hall filed a notice of appeal on June 21, 2016. On appeal, Hall contends the district court erred by denying both his motion to suppress evidence and motion to dismiss for violation of his right to a speedy trial.

II

[¶ 7] On appeal, Hall challenges the district court's denial of his motion to dismiss for violation of his speedy trial rights and denial of his motion to suppress evidence. We will first address Hall's arguments regarding the denial of his motion to dismiss. Hall argues the district court erred in denying his motion to dismiss for a violation of his speedy trial rights under N.D.C.C. § 29–19–02 and under the Sixth Amendment to the United States Constitution and Article I, Section 12 of the North Dakota Constitution. The State argues the district court properly denied the motion to dismiss.

A

[¶ 8] We review Hall's speedy trial claim with regard to his statutory

speedy trial rights. The statutory right to a speedy trial, found in N.D.C.C. § 29–19–02, provides:

> In a criminal prosecution, the state and the defendant each shall have the right to a speedy trial. The right to a speedy trial in a criminal case in which the charging instrument contains a charge of a felony offense under section 19–03.1–23 or under chapter 12.1–20 is for the trial to begin within ninety days of the date the party elects this right. The prosecution and the defendant shall elect this right within fourteen days following the arraignment. The court may allow the trial to begin later than ninety days of the arraignment for good cause.

The statutory right to a speedy trial under N.D.C.C. § 29–19–02 may be asserted by a defendant charged under "section 19–03.1–23 or under chapter 12.1–20." Hall was charged under N.D.C.C. § 19–03.1–23(1). The starting date for the 90–day window under the statute is "the date of receipt by both the court and the prosecutor[.]" *State v. Gibson*, 2017 ND 15, ¶ 6, 889 N.W.2d 852. Hall's demand for a speedy trial was received by the court and the prosecutor on February 16, 2016, and trial was scheduled for May 24, 2016. There were 98 days between Hall's election of his speedy trial rights and the scheduled trial date. Hall acknowledges the demand was filed more than fourteen days after arraignment, but argues the deadline to elect the right should be extended because he filed his demand four days after the district court denied his motion to suppress evidence. Hall does not cite any authority for this principle. The district court's denial of Hall's motion to dismiss stated:

> On February 16, 2016, Defendant filed a Demand for Speedy Trial under § 29–19–02 of the North Dakota Century Code. On February 17, 2016, a final pretrial conference was held in this matter. At that time the Court addressed the Demand for Speedy Trial noting that the demand had been made more than 90 days after the arraignment had been held in this matter. The Court further stated on the record that it was directing the Clerk of Court to schedule this matter for trial as soon as the Court's schedule would allow.

The district court denied the motion to dismiss and stated, "Based upon the foregoing and based upon the failure of the Defendant to make his demand within 14 days of the arraignment in this action, the Court hereby denies the Motion to Dismiss made by the Defendant on May 19, 2016."

[¶ 9] The plain language of N.D.C.C. § 29–19–02 indicates the fourteen-day window is mandatory in order for a party to elect the statutory speedy trial right. "The prosecution and the defendant shall elect this right within fourteen days following the arraignment." N.D.C.C. § 29–19–02. The district court correctly found the demand had been made more than fourteen days after arraignment.

[¶ 10] Section 29–19–02, N.D.C.C., also provides, "The court may allow the trial to begin later than ninety days of the arraignment for good cause." Regardless of whether the trial had been scheduled within ninety days of the demand, the trial would have occurred well beyond ninety days of the arraignment. As the district court noted, "the demand had been made more than 90 days after the arraignment had been held in this matter." This is "good cause" for permitting the trial to begin "later than ninety days of the arraignment." N.D.C.C. § 29–19–02. The record also reflects the district court made an attempt to schedule the trial as soon as possible. The district court's order alludes to the fact the clerk of court had been directed to schedule the trial "as soon as the Court's schedule would allow." Accord-

843

ingly, the district court did not err when it denied Hall's speedy trial claim construed as one under N.D.C.C. § 29–19–02.

## B

■■■ [¶ 11] Hall argues the cumulative delay violated his United States and North Dakota constitutional rights to a speedy trial. "A criminal defendant's right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and by N.D. Const. art. I, § 12." *State v. Owens*, 2015 ND 68, ¶ 8, 860 N.W.2d 817. In *State v. Fischer*, 2008 ND 32, ¶¶ 29–30, 744 N.W.2d 760 (quoting *State v. Bergstrom*, 2004 ND 48, ¶ 15, 676 N.W.2d 83), we discussed the considerations for evaluating speedy trial claims:

In *State v. Erickson*, 241 N.W.2d 854, 859 (N.D. 1976), this Court adopted the United States Supreme Court balancing test announced in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), which is used to evaluate the validity of a speedy trial claim under the United States Constitution, and now, the North Dakota Constitution, and the North Dakota statute. N.D.C.C. § 29–01–06(5). The test requires balancing four factors: length of the delay, reason for the delay, proper assertion of the right, and actual prejudice to the accused. *State v. Murchison*, 541 N.W.2d 435, 438 (N.D. 1995) (citing *Barker*, 407 U.S. at 531–33[, 92 S.Ct. 2182] ). In *Barker v. Wingo*, the Supreme Court of the United States held:

We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must

still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

*Barker*, 407 U.S. at 533, 92 S.Ct. 2182 (footnote omitted); *see also State v. Johnson*, 1999 ND 33, ¶ 21, 590 N.W.2d 192.

■■■ [¶ 12] This Court reviews a district court's speedy trial decision de novo, with the district court's findings of fact reviewed under the clearly erroneous standard of review. *State v. Moran*, 2006 ND 62, ¶ 8, 711 N.W.2d 915. Under this analysis, a delay of one year or more is "presumptively prejudicial," which triggers an analysis of the other speedy trial factors. *Id.* at ¶ 9 (quoting *Doggett v. United States*, 505 U.S. 647, 651–52, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992)).

[¶ 13] The delay in this case was not "presumptively prejudicial" since the delay for trial did not exceed one year. *Moran*, 2006 ND 62, ¶ 9, 711 N.W.2d 915. Hall makes no further arguments in his brief other than claiming a constitutional violation and citing "anxiety and concern" and "oppressive pretrial incarceration." Applying the *Barker* factors to this case, the length of the delay was not "presumptively prejudicial." Upon making a demand for a speedy trial, the trial was scheduled for a date 98 days after the demand. Next, the reason for the delay may partially be attributed to Hall because he did not demand a speedy trial until several months had already passed from the time of his arraignment and not until after the district court had denied his motion to suppress evidence. At the pretrial conference, the court informed the parties it had directed "the Clerk of Court to schedule this matter

for trial as soon as the Court's schedule would allow." "This Court has stated it is relevant whether the State purposefully delayed the trial." *Bergstrom*, 2004 ND 48, ¶ 18, 676 N.W.2d 83 (citing *Murchison*, 541 N.W.2d 435, 439 (N.D. 1995)). The State indicated in its response that it did not object to Hall's speedy trial request, but only objected to the demand being construed as a request under N.D.C.C. § 29–19–02. In its response, the State asked, "that the defendant's request be treated simply as an invocation of his constitutional rights under N.D. Const. art. I, § 12 and the Sixth Amendment of the United States Constitution." The record reflects the State did not purposefully delay trial.

[¶ 14] With regard to prejudice to the accused, no specific argument is made beyond the delay causing "anxiety and concern," and resulting in "oppressive pretrial incarceration." Pretrial incarceration has been recognized as causing societal, familial and personal problems for the accused. *Barker*, 407 U.S. at 532–33, 92 S.Ct. 2182 (discussing detrimental impact of lengthy pretrial incarceration on defendants, families of defendants, and society; characterizing time spent in jail pretrial as "dead time"). At the bond hearing, Hall stated he is from Detroit, is a full-time student, and works full-time. At the preliminary hearing, Hall stated he lives with his fiancé and four dependents. However, no specific argument has been advanced in Hall's brief on appeal or briefing at the district court to state a factual link between the pretrial incarceration and prejudice. This Court has stated, "[t]o establish actual prejudice, a defendant must factually link her loss of liberty with any specific prejudice to her right to a fair trial." *Fischer*, 2008 ND 32, ¶ 32, 744 N.W.2d 760 (internal quotation marks and citations omitted). A party raising a constitutional challenge must fully brief the issue. *Berg-*

*strom*, 2004 ND 48, ¶ 19, 676 N.W.2d 83. Hall failed to address any of the *Barker* factors on appeal. Balancing the accused's assertion of his right to a speedy trial, the length of the delay, the reason for the delay, and whether there was any prejudice to the accused, under our de novo standard of review, the district court did not err when it denied Hall's motion to dismiss for a violation of his speedy trial rights.

### III

[¶ 15] On appeal, Hall argues the district court erred when it denied his motion to suppress evidence. Hall argues the initial contact made by officers constituted a seizure unsupported by reasonable suspicion. Hall asserts he was subject to an unconstitutional seizure of his person during the dog sniff of his backpack. Hall also contends the seizure of his backpack prior to the police obtaining a search warrant was unconstitutional, and all evidence obtained after the warrant was fruit of the poisonous tree and should have been suppressed.

[¶ 16] "The Fourth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, and N.D. Const. art. I, § 8, protect individuals from unreasonable searches and seizures." *State v. Nickel*, 2013 ND 155, ¶ 13, 836 N.W.2d 405. This Court reviews a district court's decision on a motion to suppress as follows:

[T]his Court defers to the district court's findings of fact and resolves conflicts in testimony in favor of affirmance. This Court will affirm a district court decision regarding a motion to suppress if there is sufficient competent evidence fairly capable of supporting the district court's findings, and the decision is not contrary to the manifest weight of the evidence. Questions of law are fully reviewable on appeal, and whether a finding of fact

meets a legal standard is a question of law.

*State v. Knox*, 2016 ND 15, ¶ 6, 873 N.W.2d 664 (citations omitted).

A

[¶ 17] Hall first argues the initial contact with law enforcement was an unconstitutional seizure. "[A] police officer's approach of a parked vehicle is not a seizure if the officer 'inquires of the occupant in a conversational manner, does not order the person to do something, and does not demand a response.'" *City of Jamestown v. Jerome*, 2002 ND 34, ¶ 5, 639 N.W.2d 478 (quoting *State v. Langseth*, 492 N.W.2d 298, 300 (N.D. 1992)). "A seizure occurs within the context of the Fourth Amendment only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Jerome*, at ¶ 5.

[¶ 18] The district court noted the officers did not initiate a traffic stop on Hall's taxi. The district court found officers "engaged in a consensual encounter" with Hall. The district court found the officers "never ordered or showed any authority that would indicate Hall's liberty was restrained." The district court found the "facts indicate that the Officers were following a conversational manner of interaction, which is acceptable as outlined in [*Jerome*, 2002 ND 34, 639 N.W.2d 478]." There was conflicting testimony as to whether Hall was ordered out of the taxi. The officer who made the initial contact with Hall testified that he asked Hall to remove the bag from the taxi, and Hall himself removed the bag. Hall testified he was ordered to remove the bag from the taxi. When reviewing a district court's decision on a motion to suppress, this Court resolves conflicts in testimony in favor of affirmance, as we recognize the district court is in a superior position to assess credibility of witnesses and weigh evidence. *State v. Woinarowicz*, 2006 ND 179, ¶ 20, 720 N.W.2d 635. The district court's finding Hall engaged in a consensual encounter with police is supported by the record and is not clearly erroneous.

[¶ 19] Hall also argues the seizure and dog sniff of his backpack were unconstitutional. The district court concluded the temporary seizure and dog sniff of Hall's backpack did not violate Hall's Fourth Amendment rights. The district court noted the K–9 unit was already on site at the time the officer approached Hall and the sniff took place within minutes of approaching Hall. The district court found Hall was engaged in a consensual encounter and continued to speak with law enforcement while the sniff took place. After the dog alerted on the backpack, the backpack was seized and Hall was told he was free to go. Hall left after officers obtained some contact information so they could return the backpack in the event the search revealed no contraband.

[¶ 20] A dog sniff, without a seizure, is not a search. *United States v. Place*, 462 U.S. 696, 706, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). A dog sniff of luggage, which is briefly seized to conduct the sniff, is a limited intrusion and need only be supported by reasonable suspicion. The United States Supreme Court has stated:

[W]hen an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.

*Place*, 462 U.S. at 706, 103 S.Ct. 2637. This Court has stated the following regarding a K–9 sniff: "No legitimate expectation of privacy is violated by governmental con-

duct that can reveal only information about contraband and nothing about arguably private facts." *State v. Nguyen*, 2013 ND 252, ¶ 11, 841 N.W.2d 676 (internal quotation marks omitted). As a result, the temporary seizure of a piece of luggage for purposes of conducting a dog sniff requires only reasonable suspicion. *Place*, 462 U.S. at 706, 103 S.Ct. 2637.

[¶ 21] To determine whether an officer has a reasonable and articulable suspicion, this Court examines the information known to the officer at the time of the stop. *State v. Boyd*, 2002 ND 203, ¶ 15, 654 N.W.2d 392. The existence of reasonable suspicion is examined using an objective standard looking at the totality of the circumstances and "taking into consideration the inferences and deductions an investigating officer would make based on the officer's training and experience." *State v. Deviley*, 2011 ND 182, ¶ 8, 803 N.W.2d 561 (quoting *State v. Franzen*, 2010 ND 244, ¶ 12, 792 N.W.2d 533). "Whether the facts support a reasonable and articulable suspicion is a question of law." *Id.*

[¶ 22] The information known to officers before seizing the backpack to conduct a dog sniff included: the officer's knowledge that the Amtrak station is a conduit for drug trafficking into Minot from outside North Dakota; the officer's observation of Hall trying to flag down a vehicle at the Amtrak station and enter a taxi after failing to flag down the vehicle; an officer observed Hall's taxi double back and change direction in a manner consistent with an attempt to see if being followed; the officer following the taxi observed Hall exit the vehicle at an apartment known to officers to belong to an individual who had pending drug delivery charges; the officer observed Hall attempt to gain entry into the apartment patio door and attempt to get into a garage at the apartment com-

plex; when Hall failed to gain entry into the apartment and garage, he went to a fast-food restaurant where the task force officer took a photo of Hall and sent it to another agent to confirm Hall's identity; the task force officer who received the photo confirmed Hall's identity as a person suspected of trafficking drugs; the officer observed Hall walk to a gas station and enter a second taxi before traveling to a hotel. After making contact with Hall, the officers spoke to Hall. An officer testified Hall set the backpack beside him and took small steps away from the backpack while speaking with officers. The officer testified this behavior was suspicious because, in his experience, "if people have something illegal in a bag ... they'll try to separate themselves from it...." Officers testified Hall's story about why he was in Minot was suspicious. Specifically, an officer testified Hall indicated he was visiting, but also stated he had no friends or family in Minot before stating he was in Minot to look for a job. Under the totality of the circumstances, we conclude officers had reasonable suspicion to temporarily seize Hall's backpack for the purpose of conducting an on-site dog sniff.

[¶ 23] Hall also argues the officers were unable to move the backpack from the scene to obtain a search warrant. Hall cites *State v. Ressler*, 2005 ND 140, 701 N.W.2d 915, to support his argument. However, in *Ressler*, the issue was whether the officer could move a package to the police station to conduct a dog sniff armed only with reasonable suspicion. *Id.* at ¶ 15. The dog sniff of Hall's backpack was conducted on site, after developing reasonable suspicion, in order to establish probable cause for a search warrant. The movement of the backpack after the dog sniff did not implicate the same interests as the movement of the package in *Ressler*. The dog sniff added justification rising to the level

of probable cause for a greater seizure of the backpack pending approval of a search warrant application. *See State v. Gefroh*, 2011 ND 153, ¶ 9, 801 N.W.2d 429 (stating a "drug-sniffing dog indicating the presence of a controlled substance establishes probable cause"). As a result, the district court did not err in concluding Hall's Fourth Amendment rights were not violated by the officers' seizure of the backpack pending approval of a search warrant application.

### B

[¶ 24] On appeal, Hall argues the search warrant was not supported by probable cause. "A search warrant may be obtained upon a showing of probable cause." *State v. Holly*, 2013 ND 94, ¶ 12, 833 N.W.2d 15. "Probable cause exists 'if the facts and circumstances relied on by the magistrate would warrant a person of reasonable caution to believe the contraband ... will be found in the place to be searched.'" *Id.* (quoting *State v. Kieper*, 2008 ND 65, ¶ 7, 747 N.W.2d 497). "On appeal, this Court reviews the sufficiency of the information that was before the magistrate, independent of the trial court's decision, and employs the totality-of-the-circumstances test." *State v. Leavitt*, 2015 ND 146, ¶ 7, 864 N.W.2d 472. "We generally defer to a magistrate's determination of probable cause if there was a substantial basis for the conclusion, and doubtful or marginal cases should be resolved in favor of the magistrate's determination." *State v. Utvick*, 2004 ND 36, ¶ 7, 675 N.W.2d 387 (citing *State v. Ballweg*, 2003 ND 153, ¶ 12, 670 N.W.2d 490).

[¶ 25] Hall asserts on appeal the warrant was not supported by probable cause, in part, because the affidavit in support of the search warrant "contains no explanation of why the K–9's actions constituted 'positive alert' or the dog's background and/or training." The affidavit in support of the search warrant contained the following factual assertions relating to the behavior of the K–9 on scene:

> Minot Police Department Officer Titus Clouse was also on scene and conducted an open air search of the bag. At which time Officer Titus Clouse walked K9 Piko downwind of the back pack. K9 Piko had a change of behavior (COB) in his breathing rate. Officer Titus Clouse then had K9 Piko sniff the back pack and after K9 Piko sniffed the back pack K9 Piko walked past the back pack Officer Titus Clouse then scanned K9 Piko back to the back pack and K9 Piko had another COB in his breathing rate and stopped his forward movement. This COB means K9 Piko had a positive alert to an odor imprinted of a controlled substance, which occurred at 1029 hours.

During the suppression hearing, Hall's attorney argued the affidavit should have contained the K–9's qualifications:

> MR. BAUMANN: What I am talking about, Your Honor, in relationship to the information that is left out of the search warrant, is the training, the significance of the changes of behavior of the dog [Piko], and that is not contained in that.
>
> THE COURT: So, you are saying every time they do an affidavit they have to document the dog's background even though every judge in this courthouse is intimately familiar with [Piko] since [Piko] is one of, I think, only two search dogs in the community?
>
> MR. BAUMANN: Yes.
>
> THE COURT: And, why would that information have to be given to me again?
>
> MR. BAUMANN: Well, just in the face of the search—the affidavit of the search warrant should contain all the requisite information for probable cause on its fac[e].

The order denying suppression addressed Hall's argument about the failure to include the K–9's qualifications in the affidavit in support of a search warrant:

> The State does not address Hall's argument that Piko's qualifications were not included in the affidavit but this argument seems baseless—Piko is often used by the Minot Police Department and his qualifications have been put before the Court several times, the dog is qualified. Bringing forth an affidavit that states Piko alerted to the presence of controlled substances is sufficient information in the eyes of the Court.

[¶ 26] "A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable. To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs." *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999) (citations omitted). "An affidavit need not give a detailed account of the dog's track record or education." *Id.* The bar is relatively low as to how detailed the affidavit must be to show the dog's reliability. *See Florida v. Harris*, 568 U.S. 237, 133 S.Ct. 1050, 1055–58, 185 L.Ed.2d 61 (2013) (reversing Florida Supreme Court decision imposing an evidentiary checklist to establish drug dog reliability). Courts in other jurisdictions have consistently held if a dog sniff is described in an affidavit for a search warrant, the affidavit must contain some kind of statement the dog is trained and certified to detect drugs. *United States v. Kennedy*, 131 F.3d 1371, 1377 (10th Cir. 1997) ("We decline to encumber the affidavit process by requiring affiants to include a complete history of a drug dog's reliability beyond the statement that the dog has been trained and certified to detect drugs."); *United States v. Berry*, 90 F.3d 148, 153 (6th Cir. 1996) (finding an

affidavit's references to a dog as a "drug sniffing dog" and the affidavit stating the dog was trained and qualified to conduct narcotics investigations was sufficient to establish reliability of the dog); *United States v. Maejia*, 928 F.2d 810, 815 (8th Cir. 1991) (concluding an affidavit that stated the dog had been used in the past with successful results was sufficient to show reliability of the dog and stating "there is no legal requirement that the affidavit specify the number of times the dog previously has sniffed out drugs."). The affidavit in the present case contained no statements regarding the dog's training or certification. The above case law from other jurisdictions indicates without a statement attesting to the training of the dog that conducted the sniff, the sniff cannot be considered.

[¶ 27] Omitting the dog sniff from consideration, the affidavit contained sufficient information for the magistrate to determine there was probable cause Hall's backpack contained contraband. While this case presented a close question, we "generally defer to a magistrate's determination of probable cause if there was a substantial basis for the conclusion, and doubtful or marginal cases should be resolved in favor of the magistrate's determination." *Utvick*, 2004 ND 36, ¶ 7, 675 N.W.2d 387 (citing *Ballweg*, 2003 ND 153, ¶ 12, 670 N.W.2d 490). The affidavit for the search warrant recounted the information officers obtained through their surveillance of Hall's movements prior to approaching Hall and after Hall left his backpack with officers.

[¶ 28] Specifically, the affidavit included the following information: (1) an agent was conducting surveillance on the Amtrak station in Minot due to "intelligence previously gathered, such as people traveling from Michigan to Minot, ND to distribute narcotics, as well as recent arrests of individu-

als traveling via Amtrak from Michigan to Minot, North Dakota for the purpose of distributing narcotics and/or controlled substances."; (2) the officer conducting surveillance observed an unknown male on the south side of the Amtrak station "talking on his cell phone and ... walking quickly towards the east with his hand in the air and yelling in attempts to get the attention of a vehicle that had recently passed by" before entering a taxi shortly thereafter; (3) the officer followed and observed "the cab traveled westbound on 11th Ave NW and when it arrived at the intersection with Valley View Dr it made a U–Turn and traveled back eastbound on 11th Ave NW. Through my training and experience I am aware that this type of driving behavior is often used to check to see if they are being followed."; (4) the officer stated he observed the taxi travel to an apartment building where the unknown individual went directly to the patio door of an apartment "known to belong to Jacob Brandt."; (5) the affidavit stated "[Jacob] Brandt currently has pending delivery charges for delivery of oxycodone and delivery of heroin out of this apartment." The individual was also observed knocking on a garage as if to see if someone was located within the garage; (6) the unknown individual got back into the taxi and traveled to a fast-food restaurant where he was photographed and his identity was confirmed as Christian Hall by another officer; (7) officers conducted a background check which revealed Hall had previously been charged with possession of marijuana; (8) an officer observed Hall leave the restaurant and walk to a gas station, enter the gas station, exit the gas station and enter a second taxi; (9) officers approached Hall's taxi at a hotel and spoke with Hall. Hall gave police his Michigan identification card, stated he was in Minot to visit, stated he did not have any friends or family in Minot, and then also stated he was in Minot seeking a job; (10) the affidavit noted Hall gave officers three telephone numbers and stated he only had one phone after officers took the backpack; (11) the affidavit indicated three officers continued surveillance of Hall after other officers seized the backpack following the dog sniff and observed Hall go to Wal–Mart where he "purchase[d] new clothing and went into the bathroom and changed into those new clothes."; (12) the affidavit also provided an officer conferred with the security officer at Wal–Mart and learned "Hall had just had $800 wired to him from Wal–Mart to Wal–Mart."; and (13) the affidavit also stated shortly before the affidavit was presented for consideration, Hall was observed getting out of a vehicle at the Minot airport. Hall was apparently planning to leave Minot without his backpack. Under the totality of the circumstances, the affidavit presented sufficient information for the magistrate to conclude there was probable cause to believe Hall's backpack contained contraband.

[¶ 29] An affidavit's description of a dog sniff with no statement of the dog's qualifications could not, on its own, establish probable cause. However, all the above information combined established probable cause under the totality of the circumstances. The officers had sufficient information to conduct the dog sniff and seize the bag upon application for a search warrant under *Place*, 462 U.S. 696, 103 S.Ct. 2637. The affidavit explained enough of the surrounding circumstances to establish probable cause in light of the failure to include the dog's qualifications. Accordingly, the district court did not err when it denied Hall's motion to suppress evidence.

## IV

[¶ 30] We conclude the district court did not err in denying Hall's motion to dismiss for violation of his speedy trial rights un-

der both statutory and constitutional grounds. We also conclude the district court did not err in denying Hall's motion to suppress evidence. Accordingly, we affirm the criminal judgment.

[¶ 31] Carol Ronning Kapsner

Lisa Fair McEvers

Daniel J. Crothers

Jerod E. Tufte

VandeWalle, Chief Justice, concurring in the result.

[¶ 32] I concur in the result reached by the majority opinion. I agree with the statements in the majority opinion concerning what must be contained in the affidavit in support of the application for the search warrant. I also agree with statements concerning the need to set forth in the affidavit of the reliability of the drug dog if the affidavit relies on the dog's positive indication for probable cause to issue the search warrant. Nevertheless, to the extent the majority opinion appears to conclude the search warrant is defective with respect to relying on the drug dog's positive identification, in this particular instance I do not agree that it is defective. One need look only to ¶ 25 of the majority opinion for an explanation. It is apparent from the trial court's decision that the trial court was aware of the qualifications of K9 Piko. Indeed it is worth noting that the dog is referred to by name, in the affidavit, not merely as a "drug sniffing dog." While it is the information in the affidavit before the issuing magistrate and what the issuing magistrate knew about the dog that is significant, the issuing magistrate was one of the judges of "the Court" before which K9 Piko's "qualifications have been put before the Court several times."

[¶ 33] The affidavit in support of the search warrant should have contained at least minimum reference to the qualifications of the dog. It would have been a simple matter to do so. However, under these circumstances in which it is readily apparent that the officer seeking the warrant as well as the issuing magistrate were from past experience familiar with the reliability of K9 Piko, I conclude the affidavit and the search warrant are not defective for failure to state what was obvious to the officer, the issuing magistrate and the trial court from that experience with K9 Piko. The dog was reliable. Indeed, the positive indication by K9 Piko provides more substantive probable cause to issue the warrant than the other information in the affidavit upon which the majority relies, much of which involves speculation about seemingly innocent activity.

[¶ 34] Gerald W. VandeWalle, C.J.